And if we can have the attorneys for the second case, please unmute and show your cameras. Thank you. Very good. Sorry about that. Not a problem. All right. Ms. Wall. Yes, thank you, your honor. May it please the court. My name is Melissa Wall and I represent the appellants C.D. and his mother Indy. We are asking this panel to reverse the decision of the for further consideration of the procedural and substantive denials of faith identified in our briefs. This case involves a high school student who was not properly identified nor provided a faith, in other words, a free and appropriate public education, and because of these failures was substantively harmed. While there are four important points of error raised in our briefs, I ask this court to focus on two particularly troublesome issues, equitable estoppel and reliance on the student's grades and graduation from high school. First, the district court abused its discretion and committed an error of law by applying equitable estoppel to bar the parents' timely filed claims, which denied them their rights under the IDEA. In this remedial statute, Congress gave parents the right to file claims within two years of the date they knew or should have known about the alleged action forming the basis of their complaint. Applying equitable estoppel to reject claims that indisputably were filed by C.D. and Indy within the two-year statute limitations judicially overrides the plain meaning and statutory purpose of this remedial statute. Applying common theories for statutory interpretation, the district court's application of equitable estoppel to IDEA claims must fail. Under textualism, Congress very clearly gives parties two years to file. In addition, Congress identified only one situation where a consequence could be imposed on a parent for failing to dissent to an IEP within a certain time period. This is in the context of a parent seeking tuition reimbursement. We call it the 10-day notice rule. Notably, all cases cited by the district court to support its use of equitable estoppel are tuition reimbursement cases. Our case is not. Because Congress identified this one scenario and no other, it is legal error to impose additional consequences such as barring the parent's claims if a parent consents to or fails to dissent to a school decision. Under the theory of intentionalism, Congress intended this remedial statute to provide parents with relief when schools fail to provide their child a face. Applying equitable estoppel short-circuits this congressionally intended right to obtain relief. And under the theory of pragmatism, to accept the district court's application of equitable estoppel in IDEA cases would turn certainty into chaos. In all but the Eastern District of Virginia, parents and schools can rely on the fact that parties have two years within which to bring claims. In applying equitable estoppel to IDEA claims, the hearing officer and the district court were quite nebulous on when exactly it is the parent is supposed to voice this dissent. Is it six weeks? Six months? One year? This vague application of equitable estoppel will not only confuse parents, but inject chaos into an area of special education law that has been firmly settled for decades. Can I ask you a question? Even if it doesn't rise to the level of estoppel, do you agree that it's relevant whether a parent agrees with the school system that no reassessment is necessary? Looks like the Department of Education has said when conducting a re-evaluation, the school should consult with the parent, and if the parent wants a new assessment, it should be done. But if not, the school can proceed on the data it already has. So that wouldn't stop a parent, but that seems to suggest that if the parent doesn't request a reassessment, then the doesn't stop them from bringing a claim two years later. But do you agree that it's at least it's legally relevant whether the parent's consented? Yes, I do think that parent consent is a relevant point, but I think the bigger point is the equitable point, that parents don't have the same level of expertise or access to information, and certainly not the same level of access to experts to be able to effectively make these decisions on the fly immediately. It's the school district that has all of that information. And again, the parent's claim here is that the school district, based on the information it had and it reviewed on April 7th, 2021, did not see the red flags indicating that this child had deficits in and also in receptive language skills. So therefore, they did not assess the student in all areas of suspected disability. That's actually the basis of the parent's claim here. And so the fact that the parent gave consent, that is factually accurate. But the point is that the school district failed to identify and to assess all areas of suspected disability. The parent cannot be expected to have the same level of expertise or access to information or experts that the school does to immediately be able to assess whether the school district met that responsibility, that legal responsibility. It took time for results of this decision to play out for the parent to finally realize, hey, something was wrong here. And that's what Congress acknowledged when it chose to set in 2004 a two-year statute of limitations period. Prior to that, states did all kinds of things, anywhere from a matter of months to five years for parents to file. But seeing how that played out in the various jurisdictions, Congress made an affirmative choice that two years was the right amount of time for parents to learn and discover the mistakes or the problems or the negative results from the decisions that a school made. In this case, to follow up with Judge Rushing's question, here in terms of relevance, when you write parents, it's certainly not an equal possession of knowledge about the subject, parents and schools. But here, the parents did have persons with them. They didn't come along, did they, early on in terms of, because you started saying that it was not properly identified. Did the parents ever object to the identification of the exceptional educational situation here? So, two points. First of all, the parent did not have an advocate or attorney with her on April 7th, 2021 in this eligibility and IEP meeting. The advocate that she had was in 2018. And the second point, the question that you raised about did she agree with the findings? Actually, no, she didn't agree with the findings. She provided consent to a change in eligibility. And in fact, the parent has never contested that the student does not have specific learning disabilities in reading and math or other health impairment, ADHD. That's never been the parent's position. The student does in fact have those disabilities and that was confirmed in the IEP. I didn't think so either, but you started off saying that it was not properly identified. You said the problem was not properly identified. And what is the problem you're saying that wasn't identified? So, what the school missed were red flags in the documents and the information they had on April 7th, 2021, that this student also had a specific learning disability in writing, that this student also had a disability in his receptive language. And then we ultimately found later it was both expressive and receptive language. But the evidence that the team reviewed that day, April 7th, 2021, which included the 2018 evaluations, which showed that the student had deficits in receptive language. That's what they reviewed that day. Those were the red flags. And they failed to adequately assess to identify whether these suspected disabilities were in fact in place. And they ultimately, what we now know, were missed. Can I ask this? Maybe I'm not following it exactly, but your suggestion is that the red flag should have been so obvious to the school. And yet those same red flags would have been impossible for a parent to understand. Right? I'm having a little trouble sort of like balancing those two. That, you know, something has to be obvious in order for it to be a problem for the school. And yet you're sort of contrasting that by saying, but of course no parent could possibly understand that their kid couldn't read and write. Can you help me understand how to play that tension? Yes, absolutely. Our parent was an FBI agent for 21 years and now works in the DEA in compliance department. Her area of expertise is criminal law. She is not an expert in special education law. She is not an expert in speech language disabilities. She is not an expert in specific learning disabilities. That is not expertise she possesses. However, that is exactly the expertise that a school district possesses. Didn't the hearing officer address this? I mean, I thought the hearing officer found the school experts, the folks who worked with the student, more persuasive than the parent's expert in understanding what the school should have recognized in April, 2021. And the hearing officer found the school more persuasive and credited that no one there, including the parent, but also the folks who have expertise in this area, should have seen or would have seen that this at that time was an area of deficit that warranted special education. And we have a pretty high deferential standard that we apply to those findings. So how do you overcome that? So the issue here is that the responsibility for identifying all areas of suspected disability very clearly was placed on the school district, not the parent. So first of all, it's the school district's responsibility. And this is where the legal error comes in, is exactly what does it mean to suspect a disability? The Ninth Circuit, which we cited in our briefs, said it's a pretty low bar. I mean, if there's a reasonable belief that this could happen, the school district can't just rely on observations of their staff or their impressions, right? There was actually hard data in the record that showed not only the 2018 testing that showed the receptive language deficit, but the fact the student had failed his writing SOL. The fact that the teacher at that meeting in April, 2021 said he had deficits in his writing skills. How much do we need, how much evidence should be in the record to determine whether or not there's a suspicion? Is it beyond a reasonable doubt? And our position is no. And that's where the legal error came in. It's not about who had most credibility. In fact, the hearing officer found all of the expert witnesses credible. He just gave more weight to one than the other. But the problem is, what does it mean to suspect a disability? And that's what we're asking this court to address. Can I ask you a question about the hearing? It looks like the parent requested that the hearing be open to the public. Is that right? Yes. Why is the hearing transcript and most of the joint appendix under seal if the hearing was open to the public, which included the student's name, parent's name, school's name, all the disability information? Why is that under seal on appeal? The reason we did that was simple because normally, especially in these videotaped hearings where it's very controlled who actually gets in to this video conference, we try to leave the door open though if there are law students or other advocates or professionals who are trying to gain experience in observing these hearings have that opportunity to do so. But there was no one from the public who was present. And in this case, there were actually no law students present either to observe. But it was merely to make that option available for educational purposes. So are you telling me it was open to the public, but no one from the public attended and we know that for certain because it was a video proceeding? That's correct. Thank you. And I will note too that the parents thought ceiling once the documents went into the public record in the public realm when the case was filed in district court to protect the confidentiality of the student. The second point that I have trouble with this year, I wanted to make sure that we highlight is the school's reliance on and the court's reliance on CD graduating from high school and getting mostly good grades. The purpose of the IDEA as stated in the statute itself is to prepare students for further education, employment, and independent living, not specifically to graduate. And the William A case that we cited is a perfect example of this. The student graduated with 3.4 GPA and couldn't read. And the sixth circuit correctly decided was not preferred to that student. And the school board noted at page 49 of its brief that the school provided William with accommodations that masked his inability to read. That is exactly what happened to CD. The school board gave CD a credit accommodation to actually be able to graduate. Why? Because he had failed his eighth, 11th, and 12th grade writing SOLs, which is clear evidence that CD graduated without the basic fundamental writing skills that the Virginia Department of Education has said our Virginia graduates should possess. He did not. And if the school had all along had goals or provided specially designed instruction to remediate his writing deficits, and yet he still couldn't pass, that's one thing. That's not what happened here. The school never identified his specific learning disability in writing. They never provided goals in his IEPs for writing. And they never provided him with specially designed instruction to remediate his writing deficits. Providing him that credit accommodation is the only reason this kid graduated. And it was to mask the fact that the school board... He was headed to community college, right? He graduated with A's and B's and was headed to community college. Isn't that different than a case when a student can't read or write yet somehow graduated? So he didn't graduate with all A's and B's. He had some bad grades. And if you look behind the grades, for example, history, he got a... Is it okay if I continue to answer? Yes, go ahead. Yes. Thank you. You may. In history, he got a C in that class. But when you actually go back and look at the scores, which is already for the court, the specifics of that, he failed all of his tests and quizzes for almost the entire school year. Clearly, he didn't know or understand that history. And interestingly, when he went to community college, he failed two of his five classes that first semester. One was math, where he had failed in high school, and the other was history. So clearly, there has been an impact on the student in his further education, because he's struggling so much in community college. In the last two and a half years, he has had to... He's either failed or had to withdraw from many of his community college classes. So clearly, the IDA purpose of preparing him for further education did not happen here. Okay. Tell us about... Did the school recommend that he go to summer school? That was in order for him to repeat one of his math classes so he could remain on track to get an advanced diploma. And keep in mind, this is a smart kid who had, by average, a superior intelligence. He had the cognitive ability to learn how to write. He had the cognitive ability to learn how to read on grade level, but that didn't happen. But he didn't go to summer school, right? You didn't answer the question. You didn't send him to summer school. I mean, your client didn't. Yes. He did not attend summer school to retake that class. And that was against the recommendation of the school, correct? Is that right, Counselor? It was an option for him to be able to do that if he wanted to stay on the advanced diploma track. You're not answering my question. It was the decision of him not to go to summer school. That was against the recommendation of the school. It is factually correct that the student did not attend summer school. And the parents chose not to send him. Is that right? Who made that decision? I don't know factually if it was specifically the student or the parent, but ultimately the parent's responsible. So responsibility, I think, lies with the parent. All right. Any other questions? All right. Thank you. Thank you, Ms. Wah. Mr. Kafferke. Very good. Members of the panel, thank you. I'm John Kafferke for the Applee-Arlington County School Board in this case. In this case, the administrative hearing officer heard a lengthy amount of testimony, considered a number of exhibits, made a highly detailed report of his findings concerning really all these factual issues, including express findings of credibility. And the district court, as you can see from Judge Brinkman's opinion, reviewed that record carefully, both his findings, but also the record that went behind it, and determined that they were regularly made and that the hearing officer had gotten it right. Those findings, under the clear jurisprudence of this court from the Doyle case in the early 90s to the GM case just decided a year or so ago, make it clear that those findings are entitled to due weight. They're entitled to be considered prima facie correct. We submit that they are correct. One thing that I want to say up front here, because there was some discussion of this, and this is important, this is not a case, members of the panel, this is not a case where a student was improperly graduated, was pushed through, and graduates from high school, and then you find out the student can't read or write. Nobody says that. The appellant doesn't say that. The teachers who testified certainly didn't say that. And it's not just the, in fact, the teachers talked and counsel Ms. Wah called almost every teacher the student had for the last two years, and they talked about what it meant to earn a grade of A or B or whatever. And these, again, these are regular curriculum classes. These are not separate centers. These are the same English and math and social studies classes that regular high school students were taking all the way through the student's tenure in high school. But if you look, for example, at Joint Appendix 261, that's the standards of learning examination that students have to take. A student got a 440 on that, a passing score, more than a passing score in reading. Judge Brinkman talks about the fact that he got an A in English. If you look at the Joint Appendix 273 and also 473, excuse me, you'll see that the student had to pass or get credit for, it doesn't just matter if the student got good grades, but there are standards of learning examinations you have to pass to make you don't get out of high school without being able to read or write. The student absolutely did that, matriculated to college. And so just in terms of a reality check, we're not talking about one of these cases where a student gets out of school and can't read or write. I do want to talk about the estoppel point relative to much of the hearing and the briefing and the lawsuit had to do with this claim that the April 7th, 2021 eligibility committee or evaluation was somehow inadequate. Now the estoppel holding, I want to be clear, that's just an alternative holding because both the hearing officer and the district court went on to find that substantively on the merits, the evaluation was appropriate and adequately complete anyway. But I do want to come back to the estoppel holding. Estoppel in IDEA cases is something that is suggested, but I would warrant is not expressly discussed in the jurisprudence of this court. I want to make a couple points that I think are important. One is that the IDEA, the scheme that's envisioned by the IDEA, is not a unilateral scheme where the school system makes a decision on eligibility. The school system makes a decision on IEP and hands it to a parent. In fact, Judge Reisch in the GM case, the decision you talk about this, it's a cooperative scheme. It's a cooperative scheme between the school system and parents. It's a cooperative process. They work together to identify a student. They work together to develop a plan. Then both parties we submit own the result of that plan. Then there's a provision that IEPs have to be revisited at least yearly. Eligibility has to be revisited at least every three years. It's a cooperative process. Really important in that scheme is that parents have important rights that admittedly the parent was aware of here. She wasn't a special education lawyer, but she certainly was an attorney. She had used, at least in the past, educational advocates. Judge Brinkema points that out in one of her footnotes. She knew that was a thing. There are four important procedural rights. Judge Gregory, I hear your observation there. It's not by any means a one way street. Importantly in Virginia, parents have the right to consent or not consent. Virginia is in a minority of states. In most states, the school system proposes an IEP and proposes eligibility. Then they send a notice to parents. Then it's up to parents to request a hearing or mediation if they don't like the result. Virginia is one of five states. The site, by the way, I think it's in our papers, but it's 8VAC 20-81-170E where you have to get affirmative parent consent to make a change in eligibility or a change in IEP. The parent here, it isn't just that she... Some of these cases that deal with, well, a parent didn't object to the IEP or a parent didn't object to the eligibility. Importantly, look at the Joint Appendix 1628. That was my cross-examination of mom where she says not just that she didn't object, but she agreed. She affirmatively agreed to the eligibility determination in April of 2021. She also agreed, by the way, to the succeeding IEPs that were based on that eligibility. Maybe it's not a completely level playing field, but there are a number of things. Frankly, this resonates back to the discussion of Justice O'Connor in the 2005 Schaeffer versus Wiest case. That's a case that went up and down, and Judge Wilkinson's decision is a later version of the same thing. In 2005, the US Supreme Court was looking at the question of who should we put the burden of proof on? Justice O'Connor says, well, there are a number of procedural rights that parents have. Consent, I've talked about, is one of them. Parents also have the right to inspect their child's educational records. Importantly, they also have the right to get what's called an independent educational evaluation so that mom, if she had some question about the 2021 eligibility, she had the right to go out and get her own outside evaluations. She knew that. She didn't do that. Then, frankly, there are a number of dispute resolution mechanisms. Due process hearing is one. Mediation is another. We would submit inequitable. Again, we're talking here not about a bright line rule or a matter of law rule. As Judge Wilkinson says in the 2009 Fourth Circuit Schaeffer versus Wiest, we're talking about matters of degree. Does it matter that parent was aware of her rights, affirmatively agreed, allowed two IEPs to be prepared on the basis of this, and then didn't voice any objection to it? We submit that under that universe of facts that were considered both the hearing officer and Judge Brinkema that that was relevant and that that could permissibly be the basis for, as Judge Wilkinson says, and we certainly quoted it a number of times in our papers, Monday morning quarterback that decision. We submit that all the elements of estoppel are there, not just latches, estoppel. Affirmative representation, yes, I agree to that. Judge Brinkema sets this out in her decision better than I can, but taking a position, yes, I agree with this evaluation, a different position, no, I don't agree with this, and then the school system acting in reliance on that in the meantime, that that was a permissible basis for a ruling on the eligibility point. By the way, it has nothing to do, there's a lot of discussion in the appellant's papers about, well, we're not barred by the statute of limitations. No, the claim was filed literally on the last day of the limitations period, but we're not saying that challenge to the April 7th, 2021 eligibility determination was barred by the limitations period, but it's a bit like saying, well, yes, you're within your limitations period, but you're foreclosed on the basis of some other defense, whether it's an agreement or a waiver, could be a lot of reasons, but as far as... Counsel? Counsel, may I ask a question? Oh, sure, I'm sorry. No, that's fine. Do you agree that everything you were just talking about is also relevant to the substance of the school's decision, whether anyone knew at the time that there was something they were overlooking? If we perhaps have trouble getting our heads around the limits of this estoppel argument and who it would apply to and who it wouldn't, that your argument still applies to the merits? Yes, Your Honor, absolutely, and I think both the hearing officer and Judge Brinkema said as much. It's clear, as Your Honor has already said, that under the prevailing regulations, there can be situations where a whole new raft of evaluations is not required. It was permissible, as the team factually did, to look at other things, grades, IEP progress reports, and I want to make sure that the panel is clear, those are two very different things. Grades are just the report card that we're used to. IEP progress reports, which are also in the evidence, are the special education teachers look at how is the student coming on their IEP goals. So you have that, you have other testing, SOL testing, Lexile testing, I've talked some about that, and then you had what the teachers themselves were saying. So yes, that's why I said it was an alternative holding. Ultimately, the hearing officer and the district judge, in sort of a belt and suspenders approach, said if you actually look at the merits of that, they got that right. That is a factual finding. Questions of appropriateness under RF versus Cecil County Public Schools and other cases, those questions about whether something was appropriate or not, that's a factual finding that's entitled to deference under Doyle and GM and many cases. And as your honor pointed out, the hearing officer didn't just make sort of a bare factual finding, but explained, you know, I heard what the private psychologist had to say, and I found it less compelling than the school psychologist. The school psychologist, he gives a number of reasons, but yes, to answer your question, we submit that all those things bear on the substance of it. And then the final point, just coming back to Judge Gregory, something you said at the beginning is at the end of the day, they don't disagree with the disability classification anyway. It is specific learning disability and other health impaired. And so there was no disagreement on that at all. I want to move on briefly to talk about the appropriateness of the IEPs and the appropriateness of the education that the student received. And I just hear, I just have to disagree with counsel. It's true that matriculation through grades and passing grades, and this student mostly achieved better than passing grades, took things like physics, honors, this and that. It may not be everything, but it's pretty doggone important. And the court said that, the Supreme Court said that in the Rowley case, the Supreme Court said that again in the Andrew case. There's no getting around the fact that the fact that the student graduated, validly graduated again, with a regular diploma, IDEA doesn't require you to get, in order to meet that threshold standard of appropriateness, educational benefit that you get an advanced diploma or that you're on the honor roll. And counsel in her remarks talks about, well, he got a C in math and he could have done better, or even frankly, a D. In terms of both, the grades are important, but again, the IEP team didn't rely just on grades, SOLs, Lexiles, and things of that nature. And we would submit that the criticisms are really just better versus appropriate type of things. Here's one more thing. And this comes back to something the court said, the Fourth Circuit said in the 2015 OS case, which is, counsel's approach here was primarily on the appropriateness point. And really most of the hearing, as both the hearing officer and Judge Brancabaugh pointed out, was spent on these procedural issues. But there was expert testimony from special educators in support of the position that the school system's proposal was appropriate. Not so in the case of the parents case, the Fourth Circuit in the OS case said, it's hard to, may not be in that situation. Let me move on just briefly to the, let's see, oh, there's an issue of timing of the evaluations and really the, because it's true, there was an evaluation requested in mid-December. The thing I wanted to point out, which is kind of a factual point, but it's the basis on which the factual finding was of essentially no deprivation of FAPE was made. And that is this, even if the school system had proceeded with evaluation starting in December 15th of 2022, if you look at the clock, or if you look at the substantive classwork ended, because they say classes ended on June the 9th, but really the last week was just a winding up. So that's more like June the 2nd. That's only about five weeks. And it was permissible for the hearing officer and the district court to say, that's, even if we had had evaluations, it wouldn't have really, there wouldn't have been time for it to really make any difference. But in any event, you know, Judge Brankova describes the contrary point as being vastly overstated. It's a, it was up to the hearing officer and the district court to determine whether something had a substantive effect. That's what they did. And they determined that it had not. Honestly, I think those are the points that I wanted to make. I hate not to use all my time, but if members of the panel have other questions, I'm glad to entertain them. Otherwise, I do thank you for your attention. Thank you. Paul, you have some time reserved. Paul. Thank you, your honors. So just a few points I want to make based on Mr. Paprocki's statements here today. While it's true that deference is given to factual findings and credibility findings of a hearing officer that are regularly made, it's important to note that deference is not a rubber stamp. And there are examples where this fourth circuit court of appeals have found that decisions made by a hearing officer were not actually in truth by the record. Mr. Paprocki also stated that a difference between this case and the William F case is that this student can read and write. However, the factual record will dispute that because the student, again, failed his 8th, 11th, and 12th grade writing SLLs, which meant he did not meet the bare minimum standard to be able to graduate from high school with appropriate writing skills. And Dr. Henley and Ms. Sarami, the parent's expert witnesses, testified that his mixed expressive receptive language disorder would affect his reading and writing skills. Mr. Paprocki rightly pointed out that... So can I just clarify exactly what you're saying? Because it sounded like you first said the record will refute that he can read and write. But then you said maybe he just didn't have the skills he needed to graduate 12th grade with a certain amount of writing skills. Are you saying this student cannot read or write at all? No, I am not. What I'm saying is that we haven't really discussed the reading. He was below grade level. That's factually in the record when he graduated. But the writing is what I was referring to, that he did not have the requisite minimum level of writing skills that the Virginia Department of Education said we expect of our Virginia high school graduates. Okay, so that's the argument, not that he cannot write. I just want to make sure I understand what you're claiming the record represents. So you're claiming the record represents he didn't pass the standard of learning for the 12th grade for graduation and writing. Is that right? Yeah, 8th, 11th, and 12th grade. Thanks. So it wasn't a one-off. Also, about this cooperative process, if this court were to hold that it's just fine to apply equitable stockhold principles, this cooperative process intended by the IDEA is going to be blown up. Because if it becomes the law of our land that if a parent provides consent to an IEP at that IEP meeting or shortly thereafter, they have now waived for all time their right to raise claims, that now incentivizes parents to keep fighting, and fighting for a perfect IEP at the detriment of the good, which is actually giving services to the student as quickly as possible. The public policy consequences of this are devastating and completely contradict the intent and purposes of the IDEA. And I want to point out, how was the school board harmed here for equitable stockhold? Because there has to be a harm, some kind of detriment to the school. Mr. Pepperton said that the school relied on the parents' consent in creating these IEPs over time. I would argue that what the IDEA perceives is that schools aren't relying on parents' consent. Schools are relying on the data, the testing, the teacher observation, maybe grades, maybe SOL scores. This is what the school board relies on to develop an IEP. Whether the parent has given consent or not given consent is irrelevant. That has nothing to do with what information a school needs to develop an appropriate IEP. I mean, that's a pretty strong statement. I just hate to let that go. Like, what a parent thinks is irrelevant to his child's education? That's like a remarkable statement. I mean, I understand maybe that's your position, but that seems to be just a remarkable statement. May I respond? Yes, you may. That is not my position. My statement was that the school is not relying on the parent's consent when it develops an IEP. That's not what's relevant. Certainly, the parent's comments in an IEP meeting or an eligibility meeting are relevant, a student's comments, but also actual data such as SOL scores, grades, the observations of the teachers in the classroom. All of this is important information that a school uses to develop an IEP. Whether the parent agrees to whatever the IEP is that's being proposed, and keep in mind, the parent is giving consent to implement the IEP. The federal regulations, the Virginia regulations all differentiate between consent and agree. These are not the same thing. But the parent is consenting to implementing the IEP. That doesn't necessarily mean they agree with everything that is in that IEP or how the school made those decisions. In fact, oftentimes, and as the parent did testify, it's in the record, the parent believes if they don't give consent, their child will get no services at all. And frankly, some services are better than no services. So again, the fact that a parent can consent to an IEP or eligibility decision, that's not what the school is using to develop an IEP over time, and it shouldn't be. It's the actual evidence and records, the actual progress reports and things that they're relying on to develop that. So again, where's the harm to the school by the parent actually taking advantage of her statutory right to file claims within two years? Where is the harm to the school in that? They knew there was a two-year statute of limitations. All right. Thank you, counsel. Thank you both. We appreciate your arguments. Please accept our virtual greeting and handshake, and thank you for your arguments, and well done.
judges: Roger L. Gregory, Julius N. Richardson, Allison J. Rushing